UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ZECO, LLC and CHEROKEE CHEMICAL CO., LLC,

Plaintiffs,

v.

CRAIG J. SEGARS; ROCHESTER MIDLAND CORPORATION; and DOES 1 through 20,

Defendants.

No. 2:26-cv-02469-TLN-CSK

**ORDER**

This matter is before the Court on Plaintiffs Zeco, LLC ("Zeco") and Cherokee Chemical Co., LLC's ("CCI") (collectively, "Plaintiffs") *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction (ECF No. 5) which the Court construed as a motion for preliminary injunction (ECF No. 8). Defendants Craig J. Segars ("Segars") and Rochester Midland Corporation ("RMC") filed an opposition. (ECF No. 17.) Plaintiffs filed a reply. (ECF No. 19.) For the reasons set forth below, the Court GRANTS Plaintiffs' motion.

///

///

///

## I. Factual and Procedural Background

The instant action arises from Defendants' alleged misappropriation of Plaintiffs' trade secrets. (*See* ECF No. 1.) Plaintiffs and RMC are food, beverage, and industrial chemical manufacturing corporations in direct competition with each other. (*Id.* at 2.) CCI is a wholly-owned subsidiary of Zeco. (*Id.*) Segars was a Zeco employee from July 2019 until July 3, 2026, at which time he resigned and began to work for RMC. (*Id.* at 7–10.) As a condition of his employment at Zeco, Segars signed a confidentiality and non-competition agreement which prohibited him from divulging confidential company information. (ECF No. 5-5 at 14–27.) RMC hired Segars as a District Manager and made him responsible for overseeing business strategy and sales within his assigned territory. (ECF No. 5-1 at 7.)

The dispute between the parties centers on Segars's company-issued iPhone, which allegedly contained, or was capable of accessing, sensitive information owned by Plaintiffs. (ECF No. 1 at 10–11.) Plaintiffs allege that they assigned Segars a white iPhone 13 but the device he returned to them at the end of his employment was a different device: a black iPhone 12 which had been erased or factory reset. (ECF 5-1 at 6.) Segars maintains that he in fact returned his company-issued iPhone 13, and "unequivocally denies returning an iPhone 12 and denies possessing any Zeco-issued phone after his departure." (ECF No. 17 at 8.)

On July 15, 2026, Plaintiffs filed the instant action and *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction ("the Motion"), seeking to enjoin Defendants and all those acting in concert with them from accessing, using, disclosing, disseminating, copying, transmitting, or otherwise misappropriating any of Plaintiff's confidential, proprietary, or trade secret information. (ECF Nos. 1, 2.) Plaintiffs further request that the Court order Defendants not to destroy, delete, alter, conceal or modify data or documents relating to their possession or access of this information. (ECF Nos. 1, 2.) They argue that they would suffer irreparable harm in the absence of injunctive relief because Segars's allegedly deceptive behavior indicates an imminent likelihood that RMC, their direct competitor, will use their trade secrets to "bypass the time, expense, and uncertainty of independently developing customer relationships, pricing intelligence, and operational

knowledge." (ECF No. 5-1 at 23.)

## II. STANDARD OF LAW

When deciding whether a preliminary injunction should issue, courts consider whether a plaintiff has established "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff must "make a showing on all four prongs" of the *Winter* test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In evaluating a motion for preliminary injunction, a district court may weigh a plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the [plaintiff] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, "[if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in the plaintiff's favor. *Id.* at 1134–35.

## III. ANALYSIS

Defendants argue that Plaintiffs cannot satisfy any of the *Winter* elements. (ECF No. 17 at 10–18.) The Court considers each of the *Winter* elements in turn.

### A. Likelihood of Success on the Merits

Plaintiffs assert they are likely to succeed on the merits of their misappropriation of trade secrets claim.[1] (ECF No. 5-1 at 15–21.) California has adopted the Uniform Trade Secrets Act ("CUTSA"). *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993), *cert. denied*, 510 U.S. 1033 (1993). CUTSA is codified at California Civil Code §§ 3426–3426.11 and "creates a statutory cause of action for the misappropriation of a trade secret." *Brescia v. Angelin*, 172 Cal. App. 4th 133, 143 (2009). Similarly, at the federal level, Congress enacted the Defend

[1] Plaintiffs also assert they are likely to succeed on the merits of their breach of contract claim. (ECF No. 5-1 at 21–22.) However, because the Court finds Plaintiffs are likely to succeed on the merits of their misappropriation of trade secrets claim, it need not address Plaintiffs' breach of contract claim at this juncture.

Trade Secrets Act ("DTSA") which "permits the 'owner of a trade secret that is misappropriated' to bring a civil action, [pursuant to] 18 U.S.C. § 1836(b)." *ExamWorks v. Todd Baldini*, No. 2:20-CV-00920-KJM-DB, 2020 WL 3127928, at *5 (E.D. Cal. June 11, 2020), *vacated in part sub nom. ExamWorks, LLC v. Baldini*, 835 F. App'x 251 (9th Cir. 2020).

The standards for establishing misappropriation of trade secrets under federal and California law are similar. Under both the DTSA and CUTSA, a prima facie claim for trade secret misappropriation requires the plaintiff to establish: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Mastronardi Int'l Ltd. v. SunSelect Produce (California), Inc.*, No. 1:18-cv-00737-AWI-JLT, 2019 WL 3996608, at *9 (E.D. Cal. Aug. 23, 2019) (quoting *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018)). Furthermore, both "include[ ] substantially similar definitions of 'trade secret' and 'misappropriation.'" *ExamWorks*, 2020 WL 3127928, at *5. Given the substantial similarity between the statutory elements and definitions of the DTSA and CUTSA, the Court analyzes Plaintiff's federal and state trade secret misappropriation claims together.

*i. Trade Secrets*

The DTSA and CUTSA "both define 'trade secret' as information, such as a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Bemis Co., Inc. v. Summers*, No. 2:19-cv-00344-TLN-KJN, 2019 WL 1004853, at *3 (citing 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d)).

Plaintiffs argue that the information on, or capable of being accessed by, the iPhone Segars allegedly retained:

> contained a compilation of 33 individual customer contacts, associated with twelve customers, identifying the individuals responsible for placing or approving orders, the products purchased, expected order quantities and purchasing frequencies, the manner in which purchase orders are requested and processed, customer

> preferences concerning quotes, shipping charges, follow-up communications, recurring service and inventory requirements, and the timing and frequency of customer visits.

(ECF No. 5-1 at 7.)

This compilation was a "customer handoff spreadsheet" that Segars's supervisor had instructed him to generate before his departure. (*Id.* at 12.) Using screenshots that Segars allegedly took on his company-issued iPhone and emailed to himself, Segars created "an organized, account-by-account compilation of customer-specific purchasing, ordering, service, and operational information concerning 33 (thirty-three) individual contacts associated with 12 (twelve customers)." (*Id.*) Additionally, the iPhone allegedly "had access to vast and valuable trade secrets" including through Zeco's company portal, which contains "non-public, confidential, proprietary, and trade secret information, including, among others, customer and facility identities, individual contacts and contact information, products purchased, quantities sold, sales and purchasing history, prices charged, invoicing information, total sales volume, projected sales numbers, and other account information." (*Id.* at 13.) However, "Zeco . . . cut off the iPhone's ability to connect to the Company's networks" on July 6, 2026. (*Id.* at 11.)

The information Segars allegedly obtained "reflect[s] years of investment in developing customer relationships and allow Plaintiffs to compete effectively in a highly relationship-driven industry" and is the subject of "extensive measures to maintain its secrecy." (*Id.* at 17–18.) As discussed above, Segars was bound by a confidentiality agreement forbidding disclosure of confidential information. (ECF No. 5-5 at 14–27.) Defendants "do not dispute that Zeco possesses confidential business information worthy of protection." (ECF No. 17 at 11.)

"[W]here [an] employer has expended time and effort identifying customers with particular needs or characteristics," such information is a trade secret. *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521 (1997). Thus, "[i]t is well-established that a customer list may constitute a protectable trade secret." *Wyndham Resort Dev. Corp. v. Bingham*, No. 2:10-cv-01556-GEB-KJM, 2010 WL 2720920, at *5 (E.D. Cal. July 8, 2010) (quoting *Gable–Leigh, Inc. v. N. Am. Miss*, No. CV 01-01019 MMM (SHx), 2001 WL 521695, at *15 (C.D. Cal. Apr. 13, 2001)).

Given the economic value of the information at issue, Plaintiffs' efforts to preserve the secrecy of the information, and Defendants' concession that this information is confidential and worthy of protection, the Court concludes that it is a "trade secret" under the DTSA and CUTSA.

*ii. Misappropriation*

Generally, under both the DTSA and CUTSA, "'misappropriation' means either (1) the [a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) the [d]isclosure or use of a trade secret of another without express or implied consent." *Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1172 (N.D. Cal. 2020) (internal quotations and citations omitted); *Mastronardi Int'l Ltd.*, 2019 WL 3996608, at *9.

With respect to the first description, "improper means" is defined by both the DTSA and CUTSA to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy." *See* 18 U.S.C. § 1839(6)(A); Cal. Civ. Code § 3426.1(a). With respect to the second description, the statutes specify that "misappropriation" means, "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(III); Cal. Civ. Code § 3426.1(b)(2)(B)(iii).

Plaintiffs allege that Segars misappropriated trade secrets by retaining his company-issued iPhone 13 after his resignation from Zeco and attempting to return a different iPhone 12 in its place.[2] (ECF 5-1 at 6.) In opposition, Defendants deny that Segars improperly retained a Zeco

[2] Zeco Director of Inspired Performance Allison Young declares that while reviewing Segars's company email account, Ms. Young noticed "several successive emails that Mr. Segars sent from his Zeco email account to the same Zeco email account on July 1, 2026 . . . (the day before Mr. Segars' departure from Zeco)." (ECF No. 5-5 at 9.) These emails contained screenshots of the customer handoff spreadsheet Segars had prepared. (*Id.* at 10.) Standing alone, this fact does not raise an inference of misappropriation. If, as Plaintiffs allege, Segars retained his company-issued phone to access confidential information, it is unclear how that effort would have been aided by emailing screenshots to and from his company email. As Plaintiffs acknowledge "disabling Mr. Segars's access to Zeco's systems would not delete . . . screenshots

iPhone. (ECF No. 17 at 12.) They also argue that Plaintiffs have not come forward with evidence, other than speculation, indicating that Segars has disclosed trade secrets to RMC. (*Id.* at 11–13.)

To support their claim that Segars did not return his company-issued iPhone, Plaintiffs submit declarations from information technology specialists at Zeco. Steven Frix ("Frix"), a Technical Support Analyst, declares that he prepared the return-shipping label for Segars's company equipment and verified that the package Segars sent upon his resignation contained that label. (ECF No. 5-8 ("Frix Declaration") at 2–3.) After opening the package, Frix put a sticky note identifying the cell phone contained therein as the one Segars had returned. (*Id.*) Frix attaches a photograph to his declaration showing the cabinet in which he placed the returned phone. (*Id.* at 3, 6.) Chris Brown ("Brown"), Frix's supervisor, states that he retrieved the phone returned by Segars and found it was not a white iPhone 13, but a black iPhone 12, with a different unique identifying number, that had been erased or factory-reset. (ECF No. 5-6 ("Brown Declaration") at 2–12.)

In opposition, Segars declares that he returned his iPhone 13 to Zeco. (ECF No. 17-2 ("Segars Declaration") at 6.) Segars states that he was originally assigned a Samsung Galaxy company phone upon being hired by Zeco, and three or four years ago Zeco gave him an iPhone 13. (*Id.* at 5.) He denies ever possessing an iPhone 12 or sending one to Zeco. (*Id.* at 8.) Segars states that he factory-reset the iPhone 13 when he returned it because it contained his personal information and he "figured that if Zeco sought to re-assign the iPhone 13 to another employee, it would be better or easier to restore it to factory settings. [He] did not give the issue much consideration and was trying to be helpful." (ECF No. 17-2 at 6.) Segars goes on to say, "[i]f I recall correctly, the factory reset process occurred while I was trying to disconnect the iCloud account from the iPhone 13 and was not intended to be nefarious in any way." (*Id.*) Segars contends that he is the victim of Zeco's "poor record-keeping" and "submits" that the phone in

. . . or other information already stored locally" on the phone. (*Id.*) Thus, if Segars retained the phone, he would already have access to those screenshots and would have had no need to email them to himself at his company email address.

the center of the photograph attached to the Frix Declaration is the white iPhone 13 that he returned. (*Id.* at 9.)

In reply, Brown declares that he inspected the phone from the photo that Segars identified as his iPhone 13 and determined that it is a Samsung Galaxy S-22. (ECF No. 19-1 at 3.)

In weighing the parties' conflicting accounts, the Court finds Plaintiffs have presented sufficient information to establish a likelihood of success on their claim that Defendants engaged in misappropriation by improperly retaining a Zeco device. Plaintiffs have presented sufficient indicia of the chain of custody for the device Segars returned. The Frix Declaration sets forth sufficient information to show that the device Brown ultimately inspected and determined to be a black iPhone 12 was likely the device Segars had returned.

The Court also finds credible Brown's identification of the phone pictured in the Frix Declaration, which Segars claims to be his iPhone 13, as a Samsung Galaxy S-22. Defendants submit a declaration from a member of Brown's team stating that "consistent with normal practices" he discarded the case on the phone Plaintiffs received from Segars. (ECF No. 5-1 at 11; ECF No. 5-9 at 3.) Segars states in response that "Zeco's own evidence shows that it was its regular practice to keep phones in their cases once returned" but does not specify what evidence he is referring to. (ECF No. 17-2 at 9.) The phone in the center of the photograph attached to the Frix Declaration appears to have been placed inside of a case. (ECF No. 5-1 at 10.) Plaintiffs have therefore presented sufficient evidence to support their claim that Segars improperly retained his Zeco phone by returning an iPhone 12 rather than his company-issued iPhone 13.

As to Plaintiffs' contention that Segars returned a phone that had been factory-reset, Segars appears to offer contradictory explanations of his motivation for erasing the iPhone 13. He states simultaneously that he did so to protect this personal information and in an attempt to "be helpful," but also appears to suggest that it occurred accidentally while attempting to "disconnect the iCloud account from the iPhone 13 and was not intended to be nefarious in any way." (ECF No. 17-2 at 6.) Further, Segars claims that the iPhone 12 identified in the Brown Declaration was not the iPhone 13 he returned. Yet, he simultaneously attempts to explain how the phone he did return came to be erased or factory-reset. The Court does not find Segars's

explanation compelling and agrees with Plaintiffs that returning a phone in this condition supports their claim that Segars engaged in misappropriation.

As other courts have noted, "direct evidence of misappropriation is rare." *WeRide Corp.*, 379 F. Supp. 3d at 848 (quoting *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984 (N.D. Cal. 2018), *vacated and remanded on other grounds by BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231 (9th Cir. 2021)) (finding that even though plaintiff did not directly establish defendant "copied and took away any of the identified trade secrets," plaintiff nevertheless established it was likely to succeed on the merits of its trade secret misappropriation claim). Even though Plaintiffs do not have direct evidence that Defendants have misappropriated confidential information, the information provided indicating Segars returned a different phone than he was assigned is sufficient at this juncture to establish that Defendants likely obtained Plaintiffs' trade secrets through improper means and without express or implied consent. Accordingly, Plaintiffs have set forth sufficient information to establish or at minimum raise serious questions as to whether Segars engaged in misappropriation under the DTSA and CUTSA.

*iii. Damages*

The final element of trade secret misappropriation under the DTSA and CUTSA is damage to the plaintiff caused by the defendant's actions. *Mastronardi Int'l Ltd.*, 2019 WL 3996608, at *9. Plaintiffs allege "Segars wrongly possesses a vast amount of competitive data that would unfairly boost RMC in its head-to-head competition with Plaintiffs." (ECF No. 5-1 at 15.) According to Plaintiffs, this information can be used to "bypass the time, expense, and uncertainty required to develop the same knowledge independently and use it to formulate highly targeted sales efforts, propose substitute products or services, time solicitations to known customer needs, and offer pricing intended to undercut or displace Zeco or CCI." (*Id.* at 6.) Defendants do not contest the damage element of Plaintiffs' trade secret misappropriation claim. (*See generally* ECF No. 17.)

The Court finds Plaintiffs are likely to be damaged by Defendants' action. Although Plaintiffs do not submit evidence that they have suffered damages, the potential for imminent

damages is significant. That Plaintiffs have set forth information indicating Segars returned and erased a different device than the one he was issued supports a strong inference of an intent to use confidential information retained on his company-issued iPhone. Accordingly, Plaintiffs adequately establish damages by Defendants' actions.

In sum, the Court finds Plaintiffs have sufficiently established a likelihood of success on the merits of their trade secret misappropriation claims under the DTSA and CUTSA.

B. Irreparable Harm

Irreparable harm may be demonstrated by "the evidence of [Plaintiffs'] investment of time and money in the development of the secret processes misappropriated by defendants . . . since harm to [Plaintiffs'] competitive position lacks any adequate remedy at law." *IMI-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1986). Plaintiffs assert that they have no way to tell how much confidential information Segars retained, and that "[o]nce Plaintiffs' Confidential Information has been used to bypass the time, expense, and uncertainty of independently developing customer relationships, pricing intelligence, and operational knowledge, the resulting harm to Plaintiffs' customer goodwill, competitive position, and years of relationship development cannot be fully quantified or remedied through monetary relief." (ECF No. 5-1 at 23.) Defendants argue that there is no direct evidence that they have misused Plaintiffs' confidential information. (ECF No. 17 at 15–17.)

Though Plaintiffs submit no direct evidence that Defendants have in fact given confidential information to a direct competitor, the Court nevertheless finds the potential for imminent harm is significant. Accordingly, Plaintiffs establish irreparable harm to their competitive position.

C. Balance of Equities

A court balancing the equities will look to possible harm that could befall either party. *See CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009). The Court agrees with Plaintiffs that Defendants will not suffer any undue hardship if a preliminary injunction is granted. (ECF No. 5-1 at 23–24.) Plaintiffs seek an order that Defendants refrain from using Plaintiffs' confidential business information,

return this information, and preserve and prevent spoliation or destruction of any information wrongfully obtained. Indeed, Defendants acknowledge that "RMC's policy and expectation is that new employees not bring confidential information belonging to former employers into RMC systems or use such information in connection with their employment," and Defendants have an independent legal duty not to destroy evidence when litigation is reasonably foreseeable. (ECF No. 17 at 8); *see United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) ("Defendants engage in spoliation of documents as a matter of law . . . if they had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed.") (quoting *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991)). Accordingly, Defendants will suffer no undue hardship from an order requiring them to abide by their own internal policies and the law.

Conversely, if the Court does not issue a preliminary injunction, Plaintiffs maintain they risk having their confidential business information disseminated to third parties and used for competitive advantage. (ECF No. 5-1 at 23–24.) The Court finds the equities weigh heavily in Plaintiffs' favor.

D. Public Interest

Plaintiffs argue that the requested injunction is in the public interest because it "merely requires Defendants to comply with obligations already imposed by law and by contract." (ECF No. 5-1 at 24.) Defendants respond that public policy "favor[s] employee mobility and lawful competition" and would not be served by allowing Plaintiffs to "obtain extraordinary restrictions based upon nothing more than an employee's decision to join a competitor and a disputed factual issue regarding returned equipment." (ECF No. 17 at 18.)

California has a strong policy in favor of protecting trade secrets. *See Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (citing *Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) ("An equally lengthy line of cases has consistently held former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer.")).

The Court agrees that injunctive relief to prevent misuse of Plaintiffs' trade secretes

"would serve the policy of protecting trade secrets while simultaneously allowing lawful competition." *Id.* As discussed above, the requested relief is not "extraordinary." It requires only that Defendants comply with their own policies and with the law. Defendants fail to convince the Court that the requested injunction impairs employee mobility or lawful competition.

Accordingly, because Plaintiffs adequately "make a showing on all four prongs" of the *Winter* test, *Alliance*, 632 F.3d at 1135, the Court GRANTS Plaintiff's motion.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

Plaintiffs' *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction is GRANTED. (ECF No. 5.) Defendants, and all persons acting in concert with or participation with them who receive actual notice of this Order, are hereby ORDERED to be enjoined from:

1. Accessing, using, disclosing, disseminating, copying, transmitting, or otherwise misappropriating any of Plaintiffs' confidential, proprietary, or trade secret information, in any form or on any medium, including, without limitation, customer and prospect information, customer relationship information, customer contacts, pricing and sales information, purchasing histories and preferences, account histories, sales pipeline information, product recommendations, chemical formulations, application materials, and other confidential or proprietary business information belonging to Plaintiffs;
2. Retaining possession or control of any Plaintiffs' confidential or proprietary information or materials, whether stored on computers, external storage devices, cloud-based accounts, email accounts, or any other electronic or physical media;
3. Destroying, deleting, altering, concealing, or modifying any Plaintiffs' data, documents, or electronically stored information, including metadata, logs, or audit trails, that relate to Defendants' possession, access, or use of Plaintiffs' information;
4. Assisting, enabling, or permitting any third party, including any competitor of Plaintiffs, to access, use, or benefit from Plaintiffs' confidential or proprietary information;

5. Interfering with or impairing Plaintiffs' ability to recover, inspect, preserve, or forensically analyze its confidential information and systems;
6. Taking any action that would further the disclosure, use, or competitive exploitation of Plaintiffs' confidential or trade secret information pending further order of the Court;
7. Using Plaintiffs' confidential or trade secret information to contact, solicit, divert, service, or obtain business from any customer of Plaintiffs, including through the use of customer-specific pricing, contracts, purchasing history, or other proprietary information; and
8. Using Plaintiffs' confidential or trade secret information to contact, solicit, divert, service, or obtain business with any current customer of Plaintiffs.
9. Within five (5) court days, Defendants shall identify all mobile phones, tablets, computers, external storage devices, cloud-storage accounts, and other media used by Defendant Segars during the period June 1, 2026 through the present for work performed on behalf of Zeco. The parties shall thereafter meet and confer regarding a protocol for the preservation and neutral forensic examination of any such device or media reasonably believed to contain Plaintiffs' Confidential Information. If no agreement is reached, the parties shall promptly submit competing proposed protocols to the Court.
10. The bond requirement of Federal Rule of Civil Procedure 65(c) is waived.[3]

IT IS SO ORDERED.

DATED: July 31, 2026

TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE

[3] Plaintiffs request the Court exercise its discretion to waive the bond requirement because "Defendants cannot demonstrate any cognizable monetary injury from being required to preserve evidence, refrain from misappropriating Plaintiffs' Confidential Information, or return property belonging to Plaintiffs." (ECF No. 5-1 at 24–25.) Defendants do not object or present any arguments for the necessity of bond in this case. (*See generally* ECF No. 17.) Accordingly, the Court invokes its discretion to not require Plaintiffs post a bond in this case. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).